[Cite as *In re C.S.H.-B.*, 2025-Ohio-1482.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| IN RE: C.S.H.-B. | : | |
| | : | |
| | : | C.A. No. 30284 |
| | : | |
| | : | Trial Court Case No. G-2022-001636-0N |
| | : | |
| | : | (Appeal from Common Pleas Court-Juvenile Division) |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on April 25, 2025

. . . . . . . . . .

ALANA VAN GUNDY, Attorney for Appellant

CHARLES A. CLAYPOOL, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Appellant Father appeals from an order of the Montgomery County Court of Common Pleas, Juvenile Division, finding him in contempt of court for failing to pay his share of child expenses owed to Appellee Mother pursuant to a court-approved shared parenting plan. Father argues that the trial court abused its discretion in finding him in

contempt of court.   Upon review, we conclude that the trial court's order was not a final, appealable order because, while it found Father in contempt, it did not impose a specific sanction, it contemplated future action to determine the specific amount to be imposed as a sanction, and it did not fully resolve the matter.   Accordingly, Father's appeal will be dismissed for lack of a final, appealable order.

## I.   Procedural History and Facts

{¶ 2} Mother and Father are the parents of C.S.H.-B. (born in March 2021) and were never married.   On April 19, 2022, Father filed a motion in the juvenile court seeking a shared parenting plan or, in the alternative, full custody of C.S.H.-B.   Mother and Father subsequently agreed to a shared parenting plan, which was accepted by the magistrate and journalized on September 26, 2022.   The trial court adopted the magistrate's decision on September 27, 2022.   Relevant here, pursuant to the shared parenting plan, Father was designated the child support obligor and Mother the child support obligee. The parties agreed to deviate Father's child support obligation from the amount due under the statutory guidelines to zero "due to the parties equally sharing all the expenses of the child."

{¶ 3} On November 30, 2022, Mother filed a motion to show cause and to establish child support.   Mother alleged that Father had failed to reimburse Mother for any of the expenses of their child pursuant to the court-approved shared parenting plan and requested that Father be held in contempt and ordered to pay court costs.   Mother further requested the court establish a child support order.   Following Mother's filings, Father filed a motion for custody and a motion to modify parenting time.   Mother also filed a

motion for a change of custody.

{¶ 4} Following several continuances, a full hearing on the motions was scheduled for November 30, 2023. At the beginning of the hearing, Mother withdrew her motion for a change of custody, and Father withdrew his motions to modify parenting time and for a change of custody. The remaining issues before the court were Mother's motion to show cause and hold Father in contempt and Mother's motion to establish child support.

{¶ 5} Mother testified that the shared parenting plan had been entered in September 2022. In lieu of child support, the parents agreed to share the child's expenses equally on a monthly basis. Mother filed her motion for contempt on November 30, 2022, due to Father's failure to pay her since the shared parenting plan had gone into effect. Mother asked the court to establish a child support order that was retroactive to the date of the shared parenting plan because Father had not paid her anything for the support of their child.

{¶ 6} Mother stated that she had submitted receipts to Father every month via AppClose, except for the last two or three months prior to the hearing because she had not received anything from Father. Father had told Mother that he was not going to upload any further receipts due to the pending litigation. Father had not paid Mother any money since the shared parenting plan went into effect. Mother agreed that, pursuant to the shared parenting plan, if Father paid more in expenses for the child than Mother, then she would owe Father money. Mother admitted that she had paid Father nothing since the shared parenting plan had gone into effect but explained that her expenditures for the child had been more than Father's. Mother testified to Plaintiff's Ex. 9 being a list

of Mother's expenditures for the child from September 2022 until January 2023, with an additional page showing Mother's expenditures for January, February, and March 2023. The document also listed the expenses Father had provided to Mother from September 2022 until December 2022.

{¶ 7} Mother did not believe the expenses Father provided to her were all reasonable or legitimate. For example, Father submitted fees to Mother for a zoo trip, but Father submitted the cost of the admission ticket for himself and a photographer even though C.S.H.-B. received free admission. Father also submitted payment for the professional photography that was done at the zoo. Mother also complained that Father submitted receipts for buying Halloween decorations and charged her $100. Although Father submitted some receipts from stores, most of his receipts were handwritten.

{¶ 8} Mother testified that she worked at the facility where C.S.H.-B. received childcare and therefore was given a 50% discount on childcare tuition. Mother paid the childcare costs directly from her paycheck. The total cost of childcare tuition was divided among Mother's paychecks throughout the year. Mother testified that the prior year she paid $774.50 per month for childcare but was currently paying a bit less. Mother submitted pay stubs indicating that she paid $335.73 per paycheck for childcare. Mother was paid on a bi-weekly basis.

{¶ 9} Madeline Fletcher testified on behalf of Mother. Fletcher stated that she had lived with Father in April and May 2023. During that time, Father woke her up early one morning while she was still under the influence of her sleeping medication. Father asked Fletcher to write something down for him and she agreed. Father listed items and prices

and had Fletcher write those down on receipt paper and sign the bottom. Father told Fletcher that he wanted the receipts so that he could claim he had purchased items for his child and then charge Mother for them. Father told Fletcher that he had not actually purchased the items, but they had been given to him for free; these items included primarily books and clothing. Fletcher denied telling anyone that she was willing to lie to help Mother.

{¶ 10} When called as if on cross-examination, Father testified that he and Mother had entered a shared parenting plan that imposed no child support obligation and granted a deviation based on the parties' agreement to share equally in their child's expenses. Father stated that he had supplied Mother with receipts for all his expenses for their child and admitted that he had made no payments to Mother since the date of the shared parenting plan. However, Father claimed that Mother owed him money for the expenses of their child.

{¶ 11} During his testimony offered on his own behalf, Father explained that his understanding of the shared parenting plan was that both parties would keep receipts for whatever was purchased for C.S.H.-B. and then provide the receipts to the other party. When the expenses were tallied up, they would divide the expenses by two to determine who owed the other person. Whoever had the smaller amount would have that amount subtracted from the divided number, and they would owe the other party the difference. Father believed the arrangement took effect once the shared parenting plan went into effect.

{¶ 12} According to Father, based on their agreement, Father and Mother

immediately began uploading and exchanging receipts for expenses once the shared parenting plan went into effect. They both submitted receipts consistently for a couple of months. However, Mother had approached Father disagreeing with some of the receipts he had submitted, so he suggested going to mediation. Father suggested that the parties could bring their receipts to the mediation center and let a mediator decide which party should pay the other person. Father stated that he contacted the mediation center, but no mediation occurred. Although Mother initially agreed to it, she later refused to do the mediation. Later, Mother said she would bring the issue to the court and let the court determine whether the receipts were valid and who would have to pay. Father testified that he and Mother agreed not to upload any more receipts after their last court hearing.

{¶ 13} Father stated that Mother never paid him any expense differential. Based on Father's calculations from the receipts exchanged from September 2022 to June 2023, Mother owed Father $440.17. According to Father's exhibit, Mother paid more than Father in September 2022, October 2022, January 2023, February 2023, March 2023, and April 2023. In June 2023, Father claimed to have spent $2,310.37 for child expenses compared to Mother's total child expenses of $392.51. Father's exhibit identified that Mother owed Father the net amount of $440.17, solely due to the significant difference in the June 2023 expenses.

{¶ 14} Father testified that he received $37,757 a year for disability income. He did not want C.S.H.-B. to attend childcare because it was too expensive. Father offered to watch the child in his home while Mother was at work and take him to Help Me Grow or other educational places, like the library. Father was opposed to modifying the shared

parenting plan because, if he paid child support instead of sharing expenses, Father believed that his and C.S.H.-B.'s quality of life would decrease.

{¶ 15} Father stated that when Mother moved out of their home, she took all the child's clothes with her, so Father had to purchase clothes for C.S.H.-B. Father purchased clothes from stores, some from Athena Stevens, and some from Fletcher. Father stated he had receipts from the stores, but he wrote the cash receipts by hand for the clothes purchased from friends.

{¶ 16} Father submitted exhibits identifying his receipts and expenses from September 2022 through June 2023. Father testified that in August or September 2022, he took C.S.H.-B. to the Cincinnati Zoo to get professional pictures taken. Father identified in his exhibit that on September 21, 2022, he noted that the cost of the photos was $270. Father offered to give photos to Mother, but she declined. Father stopped having professional photos taken because if Mother would not share the cost, then it was going to be too expensive for Father, and Mother had objected to it.

{¶ 17} Father testified that, in November 2022, he had a receipt for $444.03 from the commissary at Wright-Patterson Air Force Base, which he claimed was all food entirely for C.S.H.-B. Father denied taking any of that food for himself and stated that he kept his child's food separate from his own. He further testified that the food was mainly of the type that could go in a freezer or a pantry.

{¶ 18} Father's receipts for December 2022 reflect that he spent $383.02 on additional food and groceries for C.S.H.-B. Father also had several written receipts for December 21, 2022, which included a receipt for $140 for 20 children's books, $200 for

assorted toys and an antique circus elephant toy box, and $870 for 2T clothing that Father testified he had purchased in bulk from either Stevens or Fletcher, but he could not recall which one. Most of the clothes purchased were used clothes, but Father stated some were new. The $200 spent on assorted new toys and the toy box was purchased from Stevens. At that time, Stevens was living with Father. Father also identified a December 2022 receipt from Walmart for $249.08, which Father testified was either for toys or groceries. In total, Father claimed he spent $1,903.02 on C.S.H.-B. in the month of December 2022.

{¶ 19} According to Father, Fletcher was upset with him for various reasons. He stated that the receipt from Fletcher was for the items listed and that he had paid her for them in cash.

{¶ 20} Athena Stevens testified on behalf of Father. Stevens testified that she had known Father since August 2022 and that the two had dated and lived together since September 2022. Stevens stated that when the shared parenting plan first went into effect, Father had to buy a lot of things because he did not have items for the child. Stevens testified that the items Father purchased more recently were for toys and educational things. Normally, Father would try to purchase items from people rather than stores because it was more cost effective and environmentally friendly, which is why there were a lot of handwritten receipts. Before Stevens and Father started dating, she wrote out a handwritten receipt to Father for buying an antique elephant toy chest. Stevens testified that she had never seen Father write out any handwritten receipts that were false or inaccurate.

**{¶ 21}** Stevens stated that she had had conversations with Fletcher about the case while she (Stevens) was living with Father, and that Fletcher had said she was going to lie about the written receipts and accuse Father of tax fraud. Stevens claimed Fletcher was mad at Father and wanted to hurt him. Fletcher purportedly told Stevens that if Father was ordered to pay a large amount of child support, then Mother promised to give Fletcher a monthly sum. Fletcher also asked Stevens to get in on it, but Stevens refused. Stevens denied that she had had any conversations with Mother.

**{¶ 22}** Stevens stated that Father had purchased several items from her including clothing, books, toys, and the toy chest. Some of the items were purchased from her while the two were living together. Stevens did not have any children of her own, but she had acquired toys from taking care of other people's children. Some of the toys were used and some were new. Some of the toys had been purchased at a garage sale. According to Stevens, about half of the clothing she had sold to Father was new and half was used. Stevens did not recall how much she had spent herself on the items.

**{¶ 23}** At some point Fletcher and Father had been in a relationship together and, while Stevens and Father were dating, Fletcher and her husband had lived with Stevens and Father in Father's home. While Fletcher was living with them, Stevens saw Father purchase some books and toys from Fletcher.

**{¶ 24}** During the summer, C.S.H.-B. stayed with Father every other week, but otherwise the child stayed with Father every other weekend. Stevens testified that the child would eat quite a bit so they would put food out for C.S.H.-B. to graze on. When meals were made, the child would eat half the food and then want to play.

{¶ 25} On January 8, 2024, the magistrate concluded that Mother had presented clear and convincing evidence and found Father in contempt for failing to reimburse Mother for the child's expenses pursuant to the shared parenting plan. The magistrate also found that it was in the best interest of the child for the shared parenting plan to be modified to include a child support order. The magistrate's decision noted that Mother asserted she had provided Father receipts for the child's expenses of $5,343.36 and that Father admitted under oath that he had not paid Mother for the expenses submitted to him. The magistrate ordered Father to pay $80 to Mother for the cost of filing the motion to show cause and $200 to Mother for attorney fees. The magistrate further ordered the following:

> Father shall pay the $280.00 within 90 days of this Order. The Father may purge the finding of contempt by paying the $280.00 within 30 days of this Order. Father has 6 months from the date of this Order to reimburse Mother for the costs incurred for the child. ($2,671.68).

Finally, the magistrate found that it was in the best interest of the child for the shared parenting plan to be modified to include a child support order for Father to pay $334.30 per month, which was to commence as of November 30, 2023.

{¶ 26} On January 29, 2024, Father filed untimely objections to the magistrate's decision along with a motion for leave to file the objections out of time. Father was granted leave to file the untimely objections.

{¶ 27} On January 31, 2024, Father filed a notice of costs paid and motion to purge the contempt order. Father stated that he had paid the $280 that he was ordered to pay

Mother in the magistrate's decision to purge the contempt finding and asked the court to purge the contempt order.

{¶ 28} On April 26, 2024, Father filed supplemental objections stating that he was only challenging the trial court's findings related to Mother's motion to show cause and the contempt finding. Father claimed that the magistrate's findings of fact and conclusions of law had been against the manifest weight of the evidence and not supported by sufficient evidence and, therefore, the magistrate had erred in finding that Father was in contempt of court by clear and convincing evidence. Mother filed a reply asking the court to overrule Father's objections.

{¶ 29} On July 10, 2024, the trial court issued an order overruling Father's objections, which Father appealed. On August 28, 2024, this court dismissed the appeal for lack of jurisdiction because the trial court's order was not a final, appealable order. In that order, we explained that the trial court had ruled on Father's objections to the magistrate's decision by overruling them, but the trial court's order had not contained the trial court's own judgment and order on the underlying contempt matter. Specifically, we noted that the trial court's order had not found Father in contempt of court, ordered any contempt sanction, or set forth any conditions for purging the contempt.

{¶ 30} On September 17, 2024, the trial court issued an amended entry that overruled in part and sustained in part Father's objections. Applying the clear and convincing evidence standard, the trial court concluded that the magistrate had not erred in granting Mother's motion to show cause and had "not abuse[d] her discretion in finding Father in contempt of court." The trial court then stated the following:

However, the record is unclear as to expenses incurred by and owed to Mother for the child. Therefore, the matter is hereby REMANDED to [the magistrate] for further findings regarding the amount of documented expenses for the child owed by Father to Mother.

The trial court included the following language relating to Father's contempt:

Father was hereby held in CONTEMPT of an Order of this Court. Accordingly, Father was Ordered to pay Mother $80.00 to cover the cost of filing her contempt motion and $200.00 towards her attorney fees. The Father purged the finding of contempt by paying the $280.00 within 30 days of the Magistrate's Order.

{¶ 31} Father timely appeals, raising a single assignment of error.

## II. Contempt and Final, Appealable Orders

{¶ 32} Father's sole assignment of error alleges that the trial court abused its discretion in finding him in contempt of court. Father contends that he could not be found in contempt of court because the trial court could not identify what amount was owed to Mother, which meant Mother had not proved by clear and convincing evidence that he was in contempt of court.

{¶ 33} Although neither party has questioned our jurisdiction over this appeal, our review of the September 17, 2024 order prompted us to consider whether it is a final, appealable order. Appellate courts have authority to sua sponte examine any deficiencies in jurisdiction. *State ex rel. White v. Cuyahoga Metro. Hous. Auth.*, 79 Ohio St.3d 543, 544 (1997). After a review of the trial court's entry on appeal, we conclude

that the trial court's order is not a final, appealable order, and therefore this appeal must be dismissed.

{¶ 34} "Contempt of court is defined as disobedience of an order of a court." *Windham Bank v. Tomaszczyk*, 27 Ohio St.2d 55 (1971), paragraph one of the syllabus. "The power of contempt is inherent in a court, such power being necessary to the exercise of judicial functions." (Citations omitted.) *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 15 (1988). "Proceedings in contempt are sui generis in the law. They bear some resemblance to suits in equity, to criminal proceedings and to ordinary civil actions; but they are none of these." *Cincinnati v. Cincinnati Dist. Council 51*, 35 Ohio St.2d 197, 201-202 (1973). "Although there has never been a clear line of demarcation between criminal and civil contempts, it is usually said that offenses against the dignity or process of the court are criminal contempts, whereas violations which are on their surface offenses against the party for whose benefit the order was made are civil contempts." *State v. Local Union 5760, United Steelworkers of Am.*, 172 Ohio St. 75, 82 (1961).

{¶ 35} "Because all contempt involves some type of sanction or punishment, the distinction between civil and criminal contempt is usually based on the purpose to be served by the sanction." *Liming v. Damos*, 2012-Ohio-4783, ¶ 12, citing *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554 (2001). "Sanctions for criminal contempt are punitive in nature and unconditional." *State v. Montgomery*, 2004-Ohio-1699, ¶ 18 (2d Dist.). "The purpose of criminal sanctions is to vindicate the authority of the court and punish past acts of disobedience and thus penalties for criminal contempt are unconditional and 'may take the shape of an absolute fine for a specific amount or a

determinate period of confinement.' " *Geary v. Geary*, 2015-Ohio-259, ¶ 44 (5th Dist.), quoting *Brown v. Executive 200, Inc.*, 64 Ohio St.2d 250 (1980). Criminal contempt proceedings require many of the same constitutional safeguards necessary as those in criminal trials, and guilt must be proven beyond a reasonable doubt in order to be punished for criminal contempt. *Brown* at 251-252. Criminal contempt proceedings also require "proof of a purposeful, willing, or intentional violation of a trial court's order." *Miami Twp. Bd. of Trustees v. Powlette*, 2023-Ohio-2890, ¶ 20 (2d Dist.).

{¶ 36} "Civil contempt sanctions, on the other hand, are remedial and are intended to coerce the contemnor into complying with the court's order." *Montgomery* at ¶ 18. " 'Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance.' " *Tomaszczyk* at 58, quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). "A prima facie case of civil contempt is made when the moving party proves both the existence of a court order and the nonmoving party's noncompliance with the terms of that order." *Jenkins v. Jenkins*, 2012-Ohio-4182, ¶ 12 (2d Dist.), citing *Wolf v. Wolf*, 2010-Ohio-2762, ¶ 4 (1st Dist.). Unlike criminal contempt, civil contempt proceedings require proof of contempt by clear and convincing evidence. *Brown* at 253.

{¶ 37} "[I]f the contempt is civil the sanction is primarily coercive in nature and must allow for purging." *State v. Kilbane*, 61 Ohio St.2d 201, 206-207 (1980). "Once the contemnor complies with the court's order, the purpose of the contempt sanction has been achieved and the sanction is discontinued." *In re Purola*, 73 Ohio App.3d 306, 312

(3d Dist. 1991), citing *Cleveland v. Ramsey*, 56 Ohio App.3d 108, 110 (8th Dist. 1988). For this reason, in civil contempt proceedings, "[t]he contemnor is said to carry the keys of his prison in his pocket, since he will be freed if he agrees to do as ordered." (Citation omitted.) *Brown* at 253.

**{¶ 38}** "[A] court order finding a party in contempt and imposing a sentence conditioned on the failure to purge is a final, appealable order on the issue whether the party is in contempt of court." *Docks Venture, L.L.C. v. Dashing Pacific Group, Ltd.*, 2014-Ohio-4254, ¶ 23. "If the [purge] conditions are unfulfilled, the court is entitled to enforce the sentence already imposed, the sanction that could have been avoided by the contemnor's compliance." *Liming*, 2012-Ohio-4783, at ¶ 16. That determination is separately made at a purge hearing. "Accordingly, an alleged contemnor may have the opportunity to appeal once from the finding of contempt and again from execution of sentence for failure to purge, presenting different issues for the appellate court to review." *Docks Venture* at ¶ 21.

**{¶ 39}** In this case, Mother's motion to show cause requested a finding of contempt for Father's failure to pay his share of their child's expenses pursuant to a valid court order: the shared parenting plan. Therefore, the purpose of the contempt proceedings, according to Mother's motion, was to force Father into compliance with the court order and compensate her for his failure to pay.

**{¶ 40}** The magistrate found Father in contempt of court and ordered Father to pay $280 within 90 days of the magistrate's decision to compensate Mother for the costs incurred in filing the contempt motion and attorney fees. The magistrate stated that

"Father may purge the finding of contempt by paying the $280.00 within 30 days of this Order." The magistrate further ordered Father to pay Mother $2,671.68 (half the total amount the magistrate found that Mother had submitted as the child's expenses that she paid) within six months from the date of the magistrate's decision to reimburse Mother for the costs incurred for the child. No conditional sanctions were imposed. After Father filed objections but before the trial court ruled on them, Father filed a notice stating that he had complied with the magistrate's decision to pay $280 to Mother and asked the trial court to find that he had purged his contempt.

{¶ 41} When the trial court issued its order overruling in part and sustaining in part Father's objections, it concluded that Father was in contempt of court using civil contempt standards. It appears the trial court intended for the contempt herein to be civil in nature; however, the trial court's order was incomplete. Although the sanction imposed by the trial court is not necessarily dispositive of whether the contempt is civil or criminal, because the distinction between criminal and civil contempt is usually based on the purpose to be served by the sanction, without a final determination by the trial court, we cannot determine whether the contempt proceedings were criminal or civil in nature. This is important because there are different standards of proof to apply if the contempt is civil (clear and convincing evidence) or criminal (beyond a reasonable doubt). *Liming*, 2012-Ohio-4783, at ¶ 12.

{¶ 42} The trial court stated that "Father purged the finding of contempt by paying the $280.00 within 30 days of the Magistrate's Order." An order to pay court costs and attorney fees are sanctions imposed by the trial court and may, under appropriate

circumstances, constitute a valid civil penalty. *See Planned Parenthood Assn. of Cincinnati, Inc., v. Project Jericho*, 52 Ohio St.3d 56, 67 (1990) ("A trial court may, within its discretion, include attorney fees as part of the costs taxable to a defendant found guilty of civil contempt."). But these orders do not resolve the contempt matter. The trial court's entry on appeal failed to include a definite amount of the child's expenses owed to Mother by Father for failing to comply with the court-ordered shared parenting plan. The trial court specifically found the amount of expenses owed to be "unclear." "[I]n the context of a contempt order, when an amount is not specified, no sanction has been determined and the finding is not a final, appealable order." *Mills v. Mills*, 2022-Ohio-4639, ¶ 11 (8th Dist.), citing *EMC Mtge. Corp. v. Pratt*, 2007-Ohio-4669, ¶ 5 (10th Dist.). " 'Final orders are those that dispose of the whole case or some separate and distinct subdivision of it while leaving nothing for future determination.' " *Barton v. Barton*, 2017-Ohio-980, ¶ 52 (2d Dist.), quoting *Carpenter v. Carpenter*, 2013-Ohio-4980, ¶ 8 (12th Dist.). Here, the trial court ordered that future action be taken to determine the amount of expenses Father would need to compensate Mother for failing to comply with the court's order. The trial court ordered the case remanded to the magistrate "for further findings regarding the amount of documented expenses for the child owed by Father to Mother." Additionally, if the trial court intended for the proceedings to be civil contempt, the trial court did not impose any conditional sanction designed to coerce Father into compliance with the court's order that would be discontinued upon Father's compliance with the sanction.

{¶ 43} By not providing a definite amount and also contemplating future action to

determine that amount, the trial court did not fully resolve the contempt matter. Likewise, if the trial court intended for the proceedings to be civil contempt, the trial court failed to provide Father with a sanction that included an opportunity to purge. At this juncture, there is no final, appealable order from which Father could properly appeal. Article IV, Section 3(B)(2) of the Ohio Constitution grants the courts of appeals "such jurisdiction as may be provided by law to review . . . judgments or final orders . . . ." "[W]ithout a final order, an appellate court has no jurisdiction." *Stewart v. Solutions Community Counseling & Recovery Ctrs., Inc.*, 2022-Ohio-2522, ¶ 4, citing *Supportive Solutions, L.L.C. v. Electronic Classroom of Tomorrow*, 2013-Ohio-2410, ¶ 10. Accordingly, we must dismiss the appeal for lack of a final, appealable order.

### III. Conclusion

{¶ 44} This appeal will be dismissed for lack of a final, appealable order.

. . . . . . . . . . . .

EPLEY, P.J. and HANSEMAN, J., concur.